UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

COREY MORRIS                       CIVIL ACTION NO. 07-cv-0080

VERSUS                              REFERRED TO:

S. R. PIERCE, ET AL              MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

**Introduction**

Corey Morris ("Plaintiff") filed this action pursuant to 42 U.S.C. § 1983 and Louisiana tort law against the City of Shreveport, six police officers, and the (then) chief of police. Plaintiff alleges that the officers subjected him to excessive force during the course of an arrest. Defendants filed a Motion for Summary Judgment (Doc. 26) that is supported by excerpts from the depositions of the officers and an affidavit from former Chief Mike Campbell. Plaintiff opposed the motion with materials including other excerpts of the officers' depositions and Plaintiff's own deposition testimony.

**Summary Judgment Standard**

Under Fed.R.Civ.P. 56(c), a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is "material" if it might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 106 S.Ct.

2505, 2510 (1986). An issue is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. Anderson, supra; B & A Pipeline Co. v. Dorney, 904 F.2d 996, 1002 (5th Cir. 1990).

**The Summary Judgment Record**

Lt. Steven Pierce, a member of the Shreveport Police Department, was on patrol when he stopped a car for "switched plates." When the car stopped, a male and female passenger got out of the car and fled on foot. The driver stayed with the car. Pierce arrested the driver, who told him that the male passenger who fled was Corey Morris (Plaintiff). Pierce radioed to alert other officers of the fleeing passengers.

Officer Paul Robinson testified that the officers were told that the male who fled was Plaintiff. Robinson testified that the officers had received roll call flyers and briefings about Plaintiff being wanted by the FBI, two local sheriff's offices, and the Shreveport Police Department for "numerous felony warrants."

Officer Toby Morrison reported to the scene with his canine partner, Andor. Morrison testified that he was also familiar with Plaintiff because Morrison had assisted federal and local agents on several attempts to locate Plaintiff and arrest him on federal and state warrants for crimes including weapons and narcotics offenses. Morrison testified that when he arrived in the area he gave a verbal warning to anyone present to identify themselves or risk being located by the dog. It was approximately 2:15 a.m., and Morrison did not receive any response. Other officers formed a perimeter around the area where they believed

Plaintiff might be found, and Morrison gave Andor the command to track within the area.

Officer Jeffrey Hammer testified that he accompanied Morrison during the search. Hammer testified that Andor gave indications to his handler that the suspect was in the area of a nearby carport. Hammer was able to see Plaintiff's shoes or feet where he was hiding underneath a car. Hammer, Morrison, and Sgt. Mark Wheeler, who also accompanied Morrison during the search, surrounded the car, and Morrison gave commands for Plaintiff to come out from underneath the car and show his hands. Plaintiff did not. Morrison testified that he decided to deploy the dog, given the seriousness of the charges for which Plaintiff was wanted, the resistance to being arrested, and the inability of the officers to search Plaintiff for weapons.

Morrison testified that Andor, who was on a 15-foot leash, bit Plaintiff on the right leg, around the ankle, and Plaintiff then "shot out" from under the car and got to his feet. Morrison testified that he again ordered Plaintiff to get on the ground, but Plaintiff took off running. Morrison testified that he then sent Andor, still on the leash, and Andor bit Plaintiff in the area of the right arm. Plaintiff was wearing a black hoodie jacket, which Plaintiff managed to shed, whereupon Plaintiff continued running. Morrison testified that he and Andor began chasing Plaintiff, with Hammer and Wheeler running along with them. Andor saw the other two officers running near his handler and began to "key" on the officers instead of Plaintiff. Morrison testified that he was nonetheless able to tackle Plaintiff from behind, in the middle of the street.

The officers testified that Morrison held Plaintiff pinned to the ground with one arm and his body weight, while Morrison held the dog leash with his other hand. The other two officers had to back away because of the dog, which was trying to protect his handler from them. Morrison testified that Plaintiff's hands were underneath him, so he gave Plaintiff commands to show his hands, but Plaintiff did not comply. Plaintiff was moving about, but he was not showing his hands. Morrison testified that he believed Plaintiff was trying to escape. Morrison testified that he eventually got Andor under control, and another officer was able to approach and "dry stun" Plaintiff with a Taser and get him to comply with the commands to show his hands. Morrison testified that he did not know which officer applied the Taser. He just saw a hand enter the fray.

Sgt. Wheeler testified that, after Andor was under control, he eased into the struggle and "got on" Plaintiff and helped try to handcuff him. Plaintiff would not release his hands, so Wheeler removed his Taser, took the cartridge off, and gave Plaintiff a five-second burst on the shoulder blade. That did not succeed in allowing the officers to gain control of Plaintiff's left arm, so Wheeler, after more commands for Plaintiff to give his hands, hit Plaintiff with a second burst, after which the officers gained control of the left hand. Wheeler then applied a third (four second) burst to Plaintiff's left buttock. Plaintiff was handcuffed and moved to the grassy neutral-area between the street and the sidewalk. Wheeler testified that Plaintiff kept trying to get up and was still being very aggressive toward the officers, so they also placed Plaintiff in leg shackles. Wheeler testified that the

only force he applied was the three Taser blows, that he never hit Plaintiff, and that he did not apply or observe the application of any force to Plaintiff after he was cuffed and shackled on the neutral ground.

Officer Robinson testified that he arrived after Plaintiff was on the ground. He recalled that Plaintiff was handcuffed, but he was "fighting just as hard to get away as a man that wasn't handcuffed." He first testified that he remembered seeing Officer Wheeler dry stun Plaintiff. Robinson testified that Wheeler "had it on his buttocks and was giving him bursts with the Taser to get him to comply or get his aggression to stop." Robinson testified that he replaced Officer Morrison, after Morrison took the dog away. Robinson placed his left knee across Plaintiff's shoulder blades. Robinson testified that Plaintiff tried to bite him, was spitting, and was trying to get up. Robinson then hit Plaintiff in the brachial plexis (in the area of a nerve between the neck and shoulder) with a closed fist two or three times. Robinson described the force as a "stun technique to try to get their mind right." Robinson said that Plaintiff quit fighting as much after the blows, but he never cooperated fully, and continued to try to get away during the entire incident.

Robinson was asked whether Plaintiff was cuffed whenever he administered the three blows. He answered "I think he was already cuffed, but I think we, I can't, I don't remember. I know he was cuffed." The intent of that statement is difficult to discern from a mere transcript.

Officer Hammer testified that he stood back while Officer Morrison struggled with Plaintiff on the ground. After Morrison got Andor under control, Hammer moved in and put handcuffs on Plaintiff. He testified that another officer was present, but he could not recall who it was. He testified that Plaintiff resisted as the handcuffs were being applied. He remembered getting one of Plaintiff's hands behind his back, but Plaintiff had the other hand beneath his body and would not release it. Hammer testified that the only force he used was to apply "control holds" and that he did not ever hit Plaintiff or use a Taser. Hammer testified that Plaintiff, after he was handcuffed, continued kicking and trying to stand up and get away. Every time the officers would get Plaintiff down, he would squirm around and try to get to his knees and was "doing everything that he could to try to get away." Hammer said that the only force he used during this time was to hold Plaintiff down, and no officer hit Plaintiff. The fire department was called to the scene to treat Plaintiff for abrasions and any dog bite wounds. Hammer did not remember any officer using a Taser on Plaintiff during the arrest.

Sgt. Toby Meeler testified that when he arrived at the scene Plaintiff was in the road and officers were attempting to handcuff him. Plaintiff was struggling to resist being placed in handcuffs. Meeler estimated the struggle lasted maybe 10 or 15 seconds after he arrived. He did not observe any officer use a Taser on Plaintiff, but he is aware from reading reports that one was used. Meeler testified that he observed the other officers move Plaintiff to the neutral ground, where Plaintiff continued to resist. Meeler admitted that his memory of the

incident was not great, and he did not recall Plaintiff being placed in leg shackles. Meeler took photographs of Plaintiff at the scene, which are on a DVD that was filed as physical exhibit 110 to Doc. 28. The photographs show abrasions around a shoulder, a knee, and some red marks and blood on Plaintiff's face. Because of clothing and angles, not all parts of Plaintiff's body are visible in the photographs.

The evidence discussed thus far obviously favors Defendants. Competing evidence comes from Plaintiff's deposition, of which Plaintiff offers pages 28-40 and 48-51. Plaintiff's testimony about how he initially encountered the officers is not included, but there is a reference to earlier testimony that Plaintiff emerged from beneath the car where he was hiding and began to jog toward a police officer. Plaintiff testified that the officer tripped him to the ground and then told him to get down. Plaintiff testified that the next thing to happen was, "They start punching on me." He testified that he was on his stomach and the officers were hitting him in his ribs "several, several times." Plaintiff was asked if he was struck anywhere else by the first officer. He answered:

> Well, yeah, I mean, I was punched in the face. And, I mean, punched in the ribs. I mean, then more officers come and, I mean -- I mean, I did -- I got knocked unconscious and everything."

Plaintiff was asked if the first officer hit him anywhere else. Plaintiff said he did not know if it was the first officer or others because "it was so many officers there" and he was on his stomach and "couldn't really see behind my back." Plaintiff admitted that the first

officers "asked me to put my hands behind my back, and I asked him how could I when he was steady punching me."

Plaintiff testified that three or four other officers quickly came to assist the first officer. He did not remember anything about their appearance other than they were all white and one "had a big ole ring on his finger ... the one what punched me in my -- in my -- in my face." Plaintiff testified that officers "punched me in my ribs, my shoulders and my face." He estimated that he was struck "a gang of times" which he defined to mean several. He also recalled that one officer had his knees on Plaintiff's shoulders. Plaintiff said that he was pinned down and trying to cover his face, so he did not know if he was struck with fists, knees, or an object. He did know that one officer (with the ring) punched him in his face with a fist "quite a few times."

Plaintiff was asked about the use of a Taser. He testified:

> If I'm not mistaken, I'm -- they got my hands before I got tased.
> And then after my hands behind my back, I was hog tied, and
> then I got tased three times.

Plaintiff testified that an officer asked him why he was "spitting blood on my concrete." Plaintiff said he replied that it was because the officers had punched him and made his mouth bleed. When Plaintiff spit again, he was punched, hog tied, and then stunned with the Taser. Plaintiff was adamant that he was handcuffed each of the three times the Taser was used on his back as he lay on his stomach.

Other than the use of force described above, Plaintiff complained that the officers dragged his knees on the concrete as they took him to the paddy wagon. Plaintiff denied that he was bitten by the dog or treated for bite wounds. Plaintiff received stitches in three spots on his face. He estimated that his pain resolved in about a month, but he testified that he still has marks on his face and scars on his knees.

**Excessive Force--Fourth Amendment**

All claims that law enforcement officers have used excessive force in the course of an arrest of a free citizen are analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 109 S.Ct. 1865 (1989). The reasonableness inquiry "is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. 109 S.Ct. at 1872 (citations and quotations omitted).

The Fifth Circuit states that a Plaintiff asserting such a claim "must show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004).

Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical operation, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others,

and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 109 S.Ct. at 1872. A Louisiana law claim for excessive force used during an arrest is also based upon the reasonableness requirement of the Fourth Amendment, as well as related state law. Mathieu v. Imperial Toy Corp., 646 So.3d 318, 322-23 (La. 1994), citing Graham; Hudspeth v. City of Shreveport, 270 Fed.Appx. 332, 338 (5th Cir. 2008).

**The Individual Officers**

Plaintiff's testimony and that of the officers are squarely at odds in several important respects, and the court cannot weigh the evidence or make credibility calls at this stage. Thus, it is Plaintiff's testimony that must govern for purposes of summary judgment. He testifies that more than one of the officers at the scene subjected him to force, including punches to the face and ribs and the use of a Taser when Plaintiff was completely restrained and neither a danger to the officers nor a threat to escape. The force that Plaintiff describes was excessive to the need, the excessiveness was objectively unreasonable, and injury resulted. Thus, Plaintiff has created a genuine issue of material fact as to whether he was subjected to excessive force in violation of his Fourth Amendment rights. And the applications of force described by Plaintiff are such that no reasonable officer could have believed that the conduct conformed to constitutional standards in light of clearly established law such as Graham, so qualified immunity is not available at this stage of the proceeding.

Plaintiff has not, however, identified which of the officers at the scene inflicted the punches, Taser stuns, or other uses of force. The record does include evidence, however, that

Officers Morrison, Wheeler, Robinson, and Hammer made physical contact with Plaintiff during the course of the arrest. Each of those officers admits to some form of physical contact with Plaintiff, whether by Taser, stun strikes, control holds, wrestling, or tackling.

Courts have denied summary judgment for officers or upheld jury verdicts against officers in similar settings where there was evidence of the use of excessive force by one or more of a group of officers, even though the plaintiff could not identify the specific officer(s) who actually employed the force. In <u>Miller v. Smith</u>, 220 F.3d 491 (7th Cir. 2000), two state troopers mistakenly believed the plaintiff was a wanted robber. Plaintiff testified that one of the two officers handcuffed him, kicked him twice in the back, punched him, stepped on his face, and yanked him around by the hair, before stealing $750 from his wallet. The district court granted summary judgment to the two officers for reasons including the inability of the plaintiff to identify the particular officer who attacked him. The Seventh Circuit reversed. It noted that Section 1983 liability may be established based on an officer's direct actions or if the officer had a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but failed to do so. Thus, the Court held, Miller could prevail at trial if he showed that one officer attacked him while the other officer ignored a realistic opportunity to intervene.

A similar situation was presented in <u>Rutherford v. City of Berkeley</u>, 780 F.2d 1444 (9th Cir. 1986) when a plaintiff testified that five or six police officers, including three defendant officers, detained him and, without provocation, threw him to the ground,

punched, kicked, and handcuffed him. The three accused officers testified at trial that they did not assault the plaintiff, but they admitted handcuffing him. At the close of the plaintiff's case, the trial judge directed a verdict for the officers because the plaintiff had not offered proof that any particular individual did any of the beating of him. The appellate court reversed. It observed that the plaintiff could not specifically state which of the three officers punched or kicked him, but the plaintiff did testify that the defendant officers were among the several officers who were surrounding him at the time and that he saw each of their faces while he was being beaten. The officers admitted that they were among the officers who arrested and handcuffed the plaintiff. From this evidence, the appellate court held, a jury could reasonably infer that the named officers were participants in punching or kicking the plaintiff. The case was remanded for a new trial.

A witness testified in <u>Senk v. Village of Northfield</u>, 961 F.2d 1578, 1992 WL 92742 (6th Cir. 1992) (unpublished) that five or six officers wrestled the plaintiff to the ground and that at least five officers were on top of him during the use of force. Two of the officers argued that they were entitled to summary judgment because the plaintiff presented no specific evidence detailing their particular participation in the alleged beating. The Sixth Circuit, citing <u>Rutherford</u>, held that the trial judge was correct to deny summary judgment when the evidence showed that the two officers were among the five officers present at the time.

Those decisions, though not binding, are logically persuasive and are consistent with Fifth Circuit precedent such as Hale v. Townley, 45 F.3d 914 (5th Cir. 1995). That decision held that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." A district court within this circuit, applying Hale and the Seventh Circuit's Miller decision, recently denied summary judgment in a similar case. The plaintiff testified that after he arrived at the police station, officers handcuffed him, asked him to face the wall, and remove his wedding ring. The plaintiff claimed that an officer then came up behind him and struck him on the head. The plaintiff asked the other officers for the name of the officer who struck him, but the other officers said that they did not see anything. The plaintiff was not able to identify the officer who struck him, despite viewing three photo line-ups, but it was undisputed that he was in police custody and surrounded by a group of officers when one of them committed the alleged assault. Those facts, together with objective evidence of a concussion, were deemed sufficient to create a genuine issue of material fact with respect to all of the officers involved. Nitsch v. City of El Paso, 482 F.Supp.2d 820 (W.D. Tex. 2007).

The same is true in this case. Plaintiff testifies to a clearly excessive use of force by multiple officers, and there is objective evidence of injuries that resulted. Plaintiff has not identified which officers struck which blow (or applied other force), but the officers themselves testify that they were present and that they did employ various degrees of force

against Plaintiff. Under these circumstances, summary judgment may not be granted for any officer other than Pierce and Meeler.

Officer Pierce merely initiated the traffic stop, and there is no evidence that he had any interaction with Plaintiff during the "chase" or arrest. Pierce, who was busy arresting the driver of the stopped car, testified that he did not go to the area where Plaintiff was arrested until Plaintiff was already in custody, fully hog tied, and another officer was taking photographs of Plaintiff. Pierce testified that he did not speak to Plaintiff, go over to him, or even remain long enough to see Plaintiff be transported from the scene. He also denied seeing any physical interaction between Plaintiff and any other officer. No other evidence places Pierce in physical contact with Plaintiff at any time. The summary judgment record does not permit even a reasonable inference that Pierce applied any force or that he was present at a time when he would have had a reasonable opportunity to prevent the application of any excessive force by another officer.

Similarly, there is no genuine issue of fact regarding the liability of Officer Meeler. Meeler responded to the call for assistance, but the other officers' struggle with Plaintiff was over within 10-15 seconds, "if that long," after Meeler arrived. Meeler Depo. p. 8. After Plaintiff was moved to the neutral ground, Meeler took photographs of Plaintiff and the scene of the arrest. Meeler then followed the paddywagon which transported Plaintiff to the LSU Medical Center, and Meeler accompanied Plaintiff in the emergency room for several hours until Meeler was relieved by another officer. There is no summary judgment evidence that

even suggests Meeler used any force on Plaintiff or that he had a reasonable opportunity to prevent the application of force by any of the other officers.

**Chief Mike Campbell**

Mike Campbell testifies by affidavit that he was the Shreveport chief of police at the time of the January 17, 2006 incident, but he has since retired. He testifies that he was not on duty at the time of the arrest of Plaintiff and was not present on Elmhurst Street when the incident occurred. He specifically denies any involvement in the arrest of Plaintiff.

Plaintiff concedes that Campbell cannot be personally liable for any actual force applied at the scene, but contends that Campbell "is an employer, and superior of the officers" at the scene, making him potentially liable with respect to the state law claims under theories of respondeat superior. "The principle of vicarious liability is codified in La. Civ. Code art. 2320, which provides that an employer is liable for the tortious acts of its employees 'in the exercise of the functions in which they are employed.'" Russell v. Noullet, 721 So.2d 868, 871 (La. 1998). Plaintiff has presented no evidence that Chief Campbell personally employed the defendant officers, whom were likely employed by the City of Shreveport. And Plaintiff has not cited any authority for the suggestion that a mere supervisor (not an employer) may be vicariously and personally liable for a tort committed by a subordinate absent any independent fault by the supervisor. See La. Civ. Code art. 2320 (masters and employers are answerable for damage occasioned by their servants, but "responsibility only attaches, when the masters or employers ... might have prevented the act

which caused the damage, and have not done it."). Plaintiff has not made an adequate factual or legal demonstration that he has a viable claim against Chief Campbell, so summary judgment will be granted with respect to all claims against Campbell.

**City of Shreveport**

The City of Shreveport will remain a defendant because of its potential vicarious liability for the state law claims against the defendant officers that remain unresolved. Plaintiff also alleged in his complaint that the City should be held liable for failing to properly screen and investigate potential hires to the police department, as well as failing to properly train and supervise its employees. Plaintiff's complaint also alleges that the actions taken against him were pursuant to a practice and custom of the Shreveport Police Department that was condoned and encouraged by the chief of police and prior mayor.

The City's motion directly challenges Plaintiff to go beyond his pleadings and produce evidence to back those allegations. Thus, the summary judgment burden shifted to Plaintiff to produce competent summary judgment evidence that would create a genuine issue of material fact on those claims. Plaintiff was asked at his deposition for his evidence of the City's alleged unconstitutional policy of violating the civil rights of citizens. Plaintiff testified that he knew "a lot of people that been beat by the Shreveport Police Department," but he could not remember any of their names. Plaintiff was then asked for his information to support the allegation that the City failed to properly screen and investigate new officers. Plaintiff could only offer that "evidently they don't" because they let officers "run around

and kill people and beat people." When asked for evidence of improper training, Plaintiff responded only, "Because they brutality." Plaintiff's memorandum in opposition does not specifically address these claims or offer any other evidence relevant to the claims.

Mere conclusory testimony, if Plaintiff's testimony even rises to that level, is not sufficient because "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'a scintilla of evidence.'" Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 399 (5th Cir. 2008). Plaintiff has not offered any specific facts from which a reasonable jury could return a verdict for Plaintiff on any of the challenged claims. Summary judgment is, therefore, appropriate with respect to all claims against the City of Shreveport, except for potential vicarious liability based on the state law claims of excessive force.

**Conclusion**

The **Motion for Summary Judgment (Doc. 26)** is, for the reasons stated above, **granted in part** and **denied in part**. The motion is granted in part by dismissing with prejudice all claims against Steven Pierce, Toby Meeler and Mike Campbell, as well as all claims against the City of Shreveport except for those based on vicarious liability related to excessive forms claims. The motion is denied in all other respects.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 17th day of September, 2008.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE